NOTICE
This Order was filed under
Supreme Court Rule 23 and
is not precedent except in the
limited circumstances al-
lowed under Rule 23(e)(1).

2021 IL App (4th) 190854-U

NO. 4-19-0854

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 13, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS,<br>Plaintiff-Appellee,<br>v.<br>CHRISTOPHER T. WESTFALL,<br>Defendant-Appellant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Appeal from the<br>Circuit Court of<br>Sangamon County<br>No. 13CF264<br><br>Honorable<br>John M. Madonia,<br>Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Presiding Justice Knecht and Justice Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court affirmed the trial court's first stage dismissal of defendant's postconviction petition because it was barred by *res judicata*.

¶ 2        In August 2015, a jury found defendant, Christopher T. Westfall, guilty of two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2012)) against K.W., defendant's estranged wife. Count I alleged penis to vagina contact and count II alleged mouth to vagina contact. In November 2015, the trial court sentenced defendant to eight years in prison on each count and ordered the sentences to be served consecutively.

¶ 3        Defendant appealed, arguing, among other things, that trial counsel was ineffective for failing to cross-examine the State's expert witnesses who testified about deoxyribonucleic acid (DNA) evidence. In November 2018, this court affirmed defendant's conviction. *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 48, 115 N.E.3d 1148.

¶ 4          In August 2019, defendant *pro se* filed a petition pursuant to the Post-Conviction

Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)), asserting he was denied his

constitutional right to the effective assistance of counsel because counsel failed to (1) investigate

the State's DNA evidence and (2) cross-examine the State's experts about weaknesses in the

DNA evidence. The trial court summarily dismissed the petition, concluding it was barred by

*res judicata*.

¶ 5          Defendant appeals, arguing the trial court erred by dismissing his petition because

(1) his claim was based on evidence outside the record on appeal and (2) this court did not

specifically address the grounds for his ineffective assistance claim on direct appeal. We affirm.

¶ 6                                    I. BACKGROUND

¶ 7                              A. The Charges and Jury Trial

¶ 8          In March 2013, the State charged defendant with two counts of criminal sexual

assault. 720 ILCS 5/11-1.20(a)(1) (West 2012). The conduct alleged was the following: penis to

vagina contact (count I) and mouth to vagina contact (count II). The alleged victim was K.W.,

defendant's estranged wife.

¶ 9          In August 2015, the trial court conducted defendant's jury trial.

¶ 10                              1. *The Evidence Presented*

¶ 11          K.W. testified that she was defendant's wife, although they had been living

separately since 2011. In July 2012, she and defendant were arguing via text messages and phone

calls. K.W. agreed to let defendant come to her house to speak in person.

¶ 12          K.W. stated defendant arrived around 1:45 a.m. and brought alcohol with him.

The two continued to argue but eventually settled down and watched TV on the couch. K.W.

testified that defendant fell asleep on the couch and soon after he did, she fell asleep there as

well.

¶ 13        K.W. testified that she awoke to defendant attacking her, trying to take off her pants. Defendant forcibly removed K.W.'s clothing, held her down on the couch, digitally penetrated her, and bit her vagina. Defendant then placed his penis in her vagina, and K.W. believed he ejaculated. Because of the way defendant was holding K.W. down on the couch, she could not breathe very well and passed out.

¶ 14        When K.W. woke up, she went to the bathroom and put on a tampon and menstrual pad. K.W. testified she was on her period at the time. K.W. threatened defendant with a hammer to make him leave. Several hours later, K.W. called the police to report the incident and went to the hospital for a sexual assault examination.

¶ 15        The State played a recorded interview of defendant conducted by the police in September 2012. In the interview, defendant repeatedly changed his story. Defendant first claimed he had not seen K.W. in months but later admitted to seeing her a few weeks prior. Defendant explained he came over because he was arguing with K.W. Defendant denied any type of sexual contact but slowly changed his story over the course of the interview to include him kissing K.W., kissing K.W. "all over," touching her vagina with his hand, and licking her vagina. Defendant repeatedly denied engaging in the above conduct before admitting to it in a slow progression. Defendant continued to deny having sex with K.W. The police told defendant semen was found during the sexual assault examination. Defendant stated it was not his and the only way it could be was if the semen was on an item from several months ago when he last had sex with K.W.

¶ 16        Jennifer Acosta-Talbot, a DNA analyst for the Illinois State Police, testified that she received K.W.'s sexual assault kit and discovered bodily fluids on K.W.'s menstrual pad.

She used three tests to determine the source of the fluids. The first test, an acid phosphate test, showed a positive result for semen. The second test, known as a P-30 test, demonstrated that "[s]emen is indicated on the stains on the pad." The third test consisted of viewing the sample under a microscope, and Acosta-Talbot testified that she did not observe sperm cells under the microscope. Defense counsel did not cross-examine Acosta-Talbot.

¶ 17 Karri Broaddus, a forensic scientist for the Illinois State Police, testified that she performed a DNA analysis on the body fluids found on the menstrual pad. Broaddus testified that a male DNA profile existed from which defendant could not be excluded. Broaddus testified that only 1 in 61 trillion African-Americans would not be excluded as the contributor of the male DNA found on K.W.'s menstrual pad. Defense counsel did not cross-examine Broaddus.

¶ 18 Defendant did not present any evidence.

¶ 19       2. *Closing Arguments*

¶ 20 During closing argument, relying especially upon the DNA evidence and the interrogation video, the State argued that it had proved defendant guilty beyond a reasonable doubt. Defense counsel, however, argued that the State had failed to prove defendant guilty because the physical evidence was so weak. Counsel highlighted that K.W. did not have any bruises or other visible signs of an altercation. Counsel also pointed out that the small laceration on K.W.'s labia could have been self-inflicted. Counsel also highlighted the timeline discrepancy of the alleged attack, which supposedly occurred at approximately 2 a.m., yet K.W. failed to report the crime until approximately 2 p.m.

¶ 21 Defense counsel also attacked the probative value of the interrogation video, arguing as follows:

   "And then we had the showing of [defendant's] statement. I would suggest

- 4 -

to you that [defendant] was naïve, unsophisticated, probably felt scared and maybe wasn't too smart[.] *** Now, he could have exercised his right to remain silent and [asserted his] *Miranda* [rights]. But, better yet, he could have just told them the truth. They gave him every opportunity to say it was consensual. *** That's exactly what it was. *** So, *** remember the circumstances upon which [his statement] was given. This isn't a college educated high IQ guy who has experience in these matters. This is a gentleman who is inexperienced, who's put in an environment where he made all kinds of mistakes. All kinds. But that doesn't make him a rapist. That doesn't make him guilty of attacking his wife."

¶ 22 Defense counsel concluded his argument by asserting that defendant and K.W. had consensual sexual relations, arguing as follows:

"The conclusion to this case is this, and this is supported by the physical evidence and by much of the testimony[.] [Defendant] went over by invitation at 2 *** in the morning to his wife's house. They visited. They talked. One thing led to another[.] [T]hey had consensual sexual relations that [were] not forced. He left. She became upset. It didn't go the way that she wanted. She called the police. And the State's problem is, again, where is the physical evidence to support what happened? This is not a case of rape."

¶ 23                          3. *The Jury's Question and Verdict*

¶ 24 After jury deliberations began, the jury sent a note to the trial court that read "[w]hich test came back positive for semen? Or was the [p]ositive sample just of bodily fluids?" The court, without objection from either the State or defendant, instructed the jury that this question was a factual determination for it to decide. Ultimately, the jury found defendant guilty

of both counts of sexual assault.

¶ 25 In November 2015, the trial court sentenced defendant to eight years in prison on each count of criminal sexual assault and ordered those sentences to be served consecutively.

¶ 26 B. The Direct Appeal

¶ 27 On direct appeal, defendant argued his trial counsel was ineffective for failing to challenge the State's DNA evidence. Specifically, defendant contended that "trial counsel provided ineffective assistance when he failed to investigate and challenge the definitive identification of the stain on the pad as semen." In response to the State's argument that the claim was best raised in postconviction proceedings because it related to trial strategy, defendant asserted that "[counsel's] errors were not a matter of any sound or reasonable trial strategy," and counsel misunderstood the forensic evidence.

¶ 28 Defendant further argued that "[a]ll of the facts which form the basis for [his] arguments regarding trial counsel's ineffectiveness are contained in the trial record, and his claims can be decided on direct appeal." Defendant noted that the State referred to lab reports that were not in the trial record, and defendant stated "[t]here is no indication that the lab report was any different from the testimony presented by the forensic scientists at trial." Defendant also asserted that trial counsel's decision to argue consensual intercourse during closing arguments "should not be used to excuse his failure to cross examine on the forensic evidence." Defendant claimed challenging the expert witnesses "would have been more in line with counsel's strategy at trial to point out the inconsistencies in [K.W.'s] account of events."

¶ 29 When addressing defendant's claims regarding DNA evidence, this court wrote the following:

"Defendant first argues that defense counsel should have cross-examined

the State's expert witnesses regarding the strength of the DNA evidence. Defendant highlights that Acosta-Talbot, a DNA analyst for the Illinois State Police, testified that she did not observe sperm cells under the microscope. Further, as evidenced by the jury's note to the trial court, defendant highlights that the jury was apparently confused about the DNA evidence. However, in this case, K.W. and defendant were an estranged married couple, and K.W. had invited defendant over to her home in the middle of the night. Rather than attack the strength of the DNA evidence, defense counsel argued that defendant had consensual sexual relations with K.W. Under the facts of this case, this was an entirely reasonable trial strategy that is virtually unchallengeable on appeal. [*People v. ]Manning*, 241 Ill. 2d [319,] 333 [948 N.E.2d 542, 550 (2001)]."

*Westfall*, 2018 IL App (4th) 150997, ¶ 66.

¶ 30                    C. The Postconviction Petition

¶ 31        In August 2019, defendant filed a postconviction petition, asserting (1) he received ineffective assistance of trial counsel because counsel failed to challenge the DNA evidence and (2) the trial court committed plain error by failing to properly question jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). Defendant attached copies of the DNA reports in support of his ineffective assistance claim. The reports stated that "semen" was "indicated" on K.W.'s menstrual pad and "[n]o semen [was] identified" from vaginal swabs. Defendant's petition restated verbatim many of the same arguments raised in his appellate briefs.

¶ 32        In November 2019, the trial court entered a written order summarily dismissing defendant's petition, concluding defendant's claims were barred by *res judicata* because he previously asserted them on direct appeal.

¶ 33    This appeal followed.

¶ 34                        II. ANALYSIS

¶ 35    Defendant appeals, arguing the trial court erred by dismissing his petition because (1) his claim was based on evidence outside the record on appeal and (2) this court did not specifically address the grounds for his ineffective assistance claim on direct appeal. We affirm.

¶ 36                    A. Postconviction Petitions

¶ 37    The Act provides a criminal defendant the means to redress substantial violations of his constitutional rights that occurred in his original trial or sentencing. *People v. Fathauer*, 2019 IL App (4th) 180241, ¶ 40, 146 N.E.3d 175; 725 ILCS 5/122-1 (West 2018). The Act contains a three-stage procedure for relief. *Fathauer*, 2019 IL App (4th) 180241, ¶ 40 (citing *People v. Allen*, 2015 IL 113135, ¶ 21, 32 N.E.3d 615); 725 ILCS 5/122-2.1 (West 2018). Within the first 90 days after the petition is filed and docketed, the trial court shall dismiss a petition summarily if the court determines it is "frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2018). A petition may be dismissed as frivolous or patently without merit only if the petition has no arguable basis either in law or in fact. *Fathauer*, 2019 IL App (4th) 180241, ¶ 40 (citing *Allen*, 2015 IL 113135, ¶ 25). Because most postconviction petitions are drafted by *pro se* defendants, "the threshold for a petition to survive the first stage of review is low." (Internal quotation marks omitted.) *Id.* ¶ 40. If a petition alleges sufficient facts to state the gist of a constitutional claim, first-stage dismissal is inappropriate. *Id.* This court reviews first-stage dismissals under a *de novo* standard of review. *Allen*, 2015 IL 113135, ¶ 25.

¶ 38    A postconviction proceeding is a collateral attack on a final judgment. *People v. English*, 2013 IL 112890, ¶ 21, 987 N.E.2d 371. The extent of review is therefore limited to issues that have not been, and could not have been, adjudicated on direct appeal. *Id.* ¶ 22. The

determinations of the reviewing court on the prior direct appeal are *res judicata* as to those issues actually decided. *Id.* Any issues that could have been presented on direct appeal but were not, are forfeited. *Id.* "[T]he doctrines of *res judicata* and forfeiture are relaxed where fundamental fairness so requires, where the forfeiture stems from the ineffective assistance of appellate counsel, or where the facts relating to the issue do not appear on the face of the original appellate record." *Id.*

¶ 39                                     B. This Case

¶ 40          On direct appeal, defendant argued that the lab reports were not necessary because nothing indicated that the witnesses (1) testified inconsistently with the reports or (2) omitted any material information from the reports. Defendant's statements on direct appeal were confirmed by the reports he attached to his postconviction petition. The reports contain statements such as the following: "Stains from pad: semen indicated" and "Semen indicated on pad. No spermatozoa identified. Blood-like stains noted." The experts' testimony was supported by the lab reports and could not have been impeached with the reports alone. Accordingly, the reports do not constitute material outside of the record on appeal sufficient to overcome *res judicata*. *People v. Woods*, 2020 IL App (1st) 162751, ¶ 67 ("A defendant cannot overcome a *res judicata* bar simply by bolstering a previously rejected claim with additional evidence. Although defendant now supports her voluntariness claim with evidence that was not part of the original appellate record, the basic factual predicate of her claim remains the same.").

¶ 41          In the alternative, defendant argues that trial counsel was ineffective for failing to investigate grounds to challenge the accuracy of the DNA evidence and the likelihood that the "semen identification" was a false positive. Defendant contends that his theory was that he placed his mouth on K.W.'s vagina but never placed his penis in her vagina. The presence of

defendant's DNA in the form of saliva is consistent with his theory and only supports one of the counts of sexual assault. Defendant asserts that counsel's failure to investigate the possibility of a false positive means counsel could not have formed a valid trial strategy. We disagree.

¶ 42        On direct appeal, this court explicitly held that counsel's decision not to challenge the accuracy of the DNA evidence was reasonable trial strategy. As we just explained, defendant presented all of the same arguments he makes in his postconviction petition to this court on appeal. Trial counsel's strategy is no less reasonable now. Defendant cannot avoid the consequences of *res judicata* with mere semantics. *People v. Terry*, 2012 IL App (4th) 100205, ¶ 29, 965 N.E.2d 533. Accordingly, we conclude that defendant's postconviction petition was barred by *res judicata* and the trial court's first-stage dismissal of that petition was proper.

¶ 43                    III. CONCLUSION

¶ 44        For the reasons stated, we affirm the trial court's judgment.

¶ 45        Affirmed.